I'm Jennifer Thurston. I represent the appellants in this case. Co-counsel is Judith Denning. She will be addressing the court as to appellants Morillo and Erickson concerning the questioning issue. Are you going to address your cross appeal first and then, or your appeal first and then take this appeal? Actually, I was going to do it all at once. All at one time? Okay. That's fine. I just, so we're clear. All the issues in this appeal stem from two basic claims, and those are questioning techniques and disclosure of evidence to the defense. As to Mr. Jagles, Mr. Modahl alleges that he established training, supervision, and policies regarding questioning and disclosure of evidence. The court, though, beginning in Ambler, has determined that this type of behavior is intimately associated to the judicial phase of the criminal process. This court in Ibarra, as well as Freeman, has reiterated that finding, that the evaluating, reviewing, and obtaining of evidence related to the prosecution is conduct that is entitled to absolute immunity as prosecutorial. The California Supreme Court in the case of Pitts v. the County of Kern decided this exact issue, and in that case determined that Mr. Jagles was entitled to be treated as a state actor because this conduct was prosecutorial. This court has adopted the Pitts rationale, and where it did not adopt the Pitts conclusion, it did so based on the factual distinctions. For example, in the case of Bishop v. the County of Inyo, this court determined that, or at least acknowledged that the Pitts situation dealt with prosecutorial actions, while the case in front of it was different. It was based upon acts that were not prosecutorial. Based upon that, it's our assertion that this court cannot distinguish the facts in this case from the Pitts case because, in fact, we're dealing with the same person and the same conduct as in Pitts. For those reasons, we would argue that prosecutorial immunity, absolute immunity to Mr. Jagles is appropriate. As to the second issue of disclosure of evidence, there are two basic pieces of evidence. The first is medical examinations of three of the children. The evidence taken most favorable to Mr. Modal indicates that Velda Murillo may have known of the examination results as to two children, not the child who testified ultimately against Mr. Modal, and these children, in fact, never even accused Mr. Modal. But assuming that she did that, at the time those examinations were obtained, Ms. Murillo was a social worker, and there's no authority here for the proposition that a social worker has a Brady duty. Again, there's no authority for the proposition that a social worker who later goes to work for a district attorney acquires a Brady duty as to confidential information she learned in her previous social work. As to the others, there's just simply no evidence that ties these particular children or these particular medical examinations to them. There is evidence that in other cases and in the prosecutions of other children that medical examinations were known to these individuals, but not as to this case. That's also true as to the tape recording. As to Velda Murillo, again, the evidence taken most favorably to Mr. Modal indicates she knew that the tape had been made. Assuming that's the case, however, again, she was a social worker without a Brady duty. As to Mr. Erickson, again, the evidence taken most favorably to Mr. Modal indicates that he was aware that the tape recording had been made and had not disclosed the tape. But at the time, the law was unsettled as to whether he was required to do that. He was a state law enforcement officer in a state case, and the tape concerned a witness who never testified or accused Mr. Modal. So what's the law that's clearly established as to him? Would it be young blood and trombetta in that line of cases? I think those are probably the most appropriate, although even in those cases, it didn't tell Mr. Erickson that this particular tape recording had to be disclosed. Again, because it wasn't a complaining witness. It wasn't an interview of the defendant. It wasn't someone who ultimately testified against Mr. Modal. Was he asked to turn over the tape? There was a discovery request where the materials were to be turned over to the defense. Mr. Erickson's – the evidence from Mr. Erickson was that he believed the tape had been destroyed according to the policy at the time of reusing tape recordings. And that was important to me because it is the policy. He was acting according to the policy, although it turns out that the tape had not been destroyed. It's important also to note that in Mr. Modal's habeas corpus petition was ultimately granted. The court in that case determined that these materials, both the tape recording and the examinations, were not in the possession of the prosecutor. In fact, found that the failure to disclose the evidence was not deliberate. On that basis, we argue that as to the other individuals, they should be entitled to qualified immunity based upon the first element of the Saussure test. There's simply insufficient evidence to demonstrate that first step, that there was a constitutional violation. And the reason is? I'm sorry? What is the reason that there's no constitutional violation as to the others? Because the law was not clearly established. Oh, no, that's a different issue. Because the facts are simply, there's just no evidence that, in fact, these people had any knowledge about the creation of this tape or any knowledge that the tape had not been given over. So you're saying even if there were a constitutional right to have the evidence in the medical exams disclosed, even if there were, these folks would not have violated it because they had no connection with it. Is that where your position is? It is to the extent that the evidence that is relied upon by Mr. Modal is information as to other prosecutions, other cases, other children, or other evidence situations. There is no evidence as to these particular people as to Mr. Modal. The evidence in particular I'm referring to is the Attorney General's report, which we have objected to below and, again, raise that issue here. But that deals with a situation not related to Modal. In fact, the report doesn't address Mr. Modal's situation at all. It addresses an entirely different prosecution, and that report was issued after Mr. Modal was convicted. It's simply insufficient to give notice. And it doesn't, even if it did give notice, it doesn't deal with Mr. Modal himself. It's important also to know the case of Devereux v. Abbey where the court observed in passing that a Brady violation doesn't necessarily demonstrate a deliberate fabrication claim. The Devereux case also as to the issues of supervisor liability is important because that case demonstrates that what Valdemarillo and Connie Erickson did did not violate a constitutional right of Mr. Modal's. There's just no evidence of a deliberate fabrication because the facts of our case are virtually identical to the facts of the Devereux case. The behaviors alleged in Devereux, in fact, are more egregious than the behaviors alleged here. In fact, Mr. Modal's complaint doesn't even allege a deliberate fabrication claim. And I understand that Devereux wasn't decided at that time, but Myers v. Morris was. In that case, the court determined in 1984 there's just simply no constitutional right to have a child witness interviewed in any particular manner, which is actually the same holding of Devereux on that point. It also established in 1984 there was an established methodology for how these children are to be interviewed. Well, yes, but the allegation here at least is that Morillo and Carol Darling tricked Carly Jo, I've forgotten her name. There's a lot. Carly Jo. Carly Jo, okay. Into finally saying that she had been molested by the defendant by a number of assertions that were false, and that she knew that asking those questions, and we're not into leading questions or continuing to ask repetitive questions or whatever, this was a charge that there was deliberate falsehood told to the child in order to get her to implicate the defendant. I could just make one comment about Carol Darling. In fact, the court had previously granted Ms. Darling summary judgment on the first cause of action, finding that there was no evidence she actually was tied to these children. So I think the allegation truly from Mr. Modal is that she established some sort of a questioning technique that Velda Morillo herself used. As to Connie Erickson and Velda Morillo, that is the allegation from the child, but the evidence shows that, in fact, what we are dealing with is leading questioning. She doesn't go so far to say, well, you know, she says they tricked me, but not that she, I think it's just a slightly different situation than the court has presented. She says that they didn't, they wouldn't stop asking me. They wore me down until I finally said what they wanted to hear, and I did that because I thought that my dad would not go to prison. That's exactly the type of situation in Devereaux where they disbelieved the child and continued to ask questions until they obtained what they thought was the truth. It's important to note in Mr. Modal's response to our summary, the separate statement of undisputed facts, that he, in fact, alleges or admits that Velda Morillo, Connie Erickson, or the defendants as a whole disbelieved the denials that Jeff Modal molested Carla Jones. Now I'm doing it. If that's the case, then the reverse is true, too, that they did believe that Jeff Modal molested Carla Joe. Based upon that analysis, we would submit that the supervisors had no notice and no reason to know what was going on, and on that basis, for the reasons already set forth in the brief, should also have qualified immunity. I'm going to defer now to co-counsel. Denny? May it please the Court. My name is Judith Denny, and I represent individual defendants Connie Erickson and Velda Morillo with respect to the plaintiff's claim that the questioning techniques used by these parties violated his constitutional rights. If the Court would care to have me continue to discuss this issue, I know it was discussed some by my co-counsel. I will continue if the Court wishes to hear other issues. Again, that attorney is prepared to deal with those. With respect to this issue, I will continue. To make out a claim of a constitutional rights violation in this situation, the plaintiff would have to make a showing to survive summary judgment, a showing of dishonesty, of deliberate fabrication. As this Court in Devereux v. Abbey made clear, while a person might have a constitutional right not to be charged with or, as in this case, convicted of a crime based on false evidence fabricated by the government, that person doesn't have a constitutional right to a perfect questioning technique of witnesses, especially children, sexual abuse victims. And therefore, the Court requires that a plaintiff make out a showing of dishonesty, of fabrication of evidence by either one of two ways, that the interrogators knew he was innocent and continued with the line of questioning, obtaining from that questioning fabricated evidence, or that they conducted their interviewing in such an abusive, coercive manner that they knew or should have known that it was going to yield only false testimony. Those facts aren't present in the record. Basically, the Court holds those standards because it's recognized and the Court had pointed out in Myers v. Morris that the law in 1984 was very unclear with respect to techniques that could be used with victims of sexual abuse, child, juvenile victims, as to how these techniques could be used and how far they could go before constitutional rights of the accused were violated. And also, I'm not sure. Are you arguing that there's no constitutional right that was violated, or are you arguing that the law, whatever it is, wasn't clearly established at the time? Well, I think that that is basically the same argument. No, it's not. Okay. Well, I do believe that the law was not clearly established in 1984 as to what type of conduct concerning interviews would violate constitutional right. And on that basis ---- Well, the first thing we have to do is to decide whether there is a constitutional right that is at issue, right? Right. And I believe that the only constitutional claim here, which I think I would submit is not a violation of a constitutional right, deals with the questioning techniques themselves, and that is not a violation of a constitutional right. Ever. So you would want us to go into F-3rd saying that no matter what questioning techniques are used by a law enforcement officer or a social worker, a suspect ---- I mean, a suspect's constitutional rights cannot be violated if he is tried on charges that result from it. I would say that absent a showing that there was knowledge of the person's interviewing Brackenscrew is okay? Pardon me? I mean, is it okay to torture? No, Your Honor. But ---- Okay. So my statement can't quite be right, I assume. I mean, look, under Saussure, we are obliged to say what is the asserted constitutional right that was violated, and is there a ---- does the conduct charge amount to a constitutional violation, okay? So it does make a difference. Then we can say, well, that's the recognized constitutional right, but in 1985, a reasonable law enforcement officer, a reasonable social worker, a reasonable whatever, wouldn't have realized that. Well, I would basically submit then that the claim, the constitutional right that's being violated by plaintiffs, or the plaintiff's claim, is that the questioning and the conduct during the interviews is a constitutional rights violation, and I would submit that it is not. That is not a clear constitutional right at that point in time, if even now. However, assuming that the court were to find that a plaintiff has actually made a claim for deliberate fabrication of evidence, which seems to be the thrust of the claim, even though I don't think that's clearly alleged or substantiated in the record, again, based on interviewing techniques, which were the law was not clear as to what conduct would or would not violate a person's right at that time, again, I don't think that he has shown appropriate evidence for that. Okay. Taking the evidence that plaintiff does submit, showing that the child says that, again, as pointed out by co-counsel, that plaintiff alleges that the interviewers didn't believe the child when she denied abuse by defendant. And, again, that's one of the reasons that interviewers are to be given latitude is to pursue the child. But what happens if she lies to the child and tells you she'll never see her father again unless she says that he engaged in inappropriate conduct toward her? Is that okay? Your Honor, I'm not going to say that that's okay, but I do think that, again, because it was so unclear as to how far an interviewer could go, that I don't think they were on clear notice at that time. Okay. That may be correct. But as of today, is that or is that not a violation of a constitutional right? I'm not sure that that's even clear today, Your Honor, while there have been some cases. Well, you know what's going to make it clear? It takes one stroke of a pen. We walk off the bench to say it is a constitution, it violates the Constitution for an interrogator, whether they're a social worker or a law enforcement officer, to lie deliberately to a child in order to have that child implicate a person who becomes a defendant and is convicted. Now, we could do that. Should we or should we not? Well, Your Honor, I would submit that the Court has recognized that there have been techniques that are considered manipulative. Children have accused their interviewers eventually after they've recounted of tricking them. And, again, I think the rest of the record should be reviewed, which in this case doesn't really substantiate that. The interview in which Carla Jo did accuse plaintiff was the second interview with her. Those interviews were not six-hour interviews in which she denied and wasn't let go until she finally accused. I believe they were an hour to an hour and a half long. The plaintiff has also requested that the Court look at interviews with other children involving these particular defendants and infer that, therefore, the interviews with Carla Jo were probably the same. And I would show the Court or indicate to the Court in the record there is a transcript of an interview with the first child in this home, which was, again, relatively short. She did deny. They did question her as to whether plaintiff or anyone else in the home, other than the two uncles, were abusing her, and she denied that. They let that question go. They did not continue to harangue her and accuse her or berate her until she admitted it. If we were to infer that that's the same conduct used in interviewing Carla Jo, then I would submit that that's not, that that level does not rise to a level of conduct where a reasonable person would know that that testimony resulting would be false. I think that under the circumstances of the family, the abuse that had gone in that family before, with which this particular social worker was familiar, leading to a conviction in 1980, they had every reason to take measures, perhaps measures that are now determined improper or not according to guidelines. But I think that they were doing their job the best they knew how at that time under the status of the law with regard to interviews of children. Just about, in fact, you have used up all of your time. We'll give you a little bit of time to rebut, but you better stop. Thank you. May it please me. May it please the court. I'm Mike Snedeker. I'm going to appear on behalf of Mr. Modell as appellee. And my colleague, Mr. Masson, will appear as representing Mr. Modell as appellant. And I'd like to use a maximum of ten minutes, please. At the outset, I'd like to clear up some factual misrepresentations. Connie Erickson swore under oath that he did not make a recording in the case of Teresa Modell. He answered only three months prior to the investigation in this case at a preliminary hearing for someone who he and Velda Murillo had also interviewed that he made no recordings. In 1998, in the habeas corpus proceedings, he said he had no memory of ever having made a recording. Finally, in April of 2000, he says that that's the way we did it. We recorded these interviews, and then we destroyed the tapes. So it's very murky. Now, in the name of accuracy, if I'm following you now, but at issue here are recordings not of any witness that testified against your client. It's recordings of other youngsters. Am I right? He testified that he made no recordings in the interview of any of the children who were investigated in this case. You don't have a recorded interview of the accuser. We do not. And he never falsified whether or not he recorded that witness. We don't know, Your Honor, if he says that. We know that he said that he never did interview her, but now he's saying that it was his habit. Well, okay, but just for accuracy, am I with you or not? You are if we have no example now of any tape recording of Carla Jo Modell. Okay, or any other, and there were no other child witnesses against your client? No, there weren't. All right. Now, whether, you know, it's another step as to whether or not interviewing somebody else makes a difference, because I gather your argument is, well, it was a pattern. If he did it, that's the way he did it. That's correct, Your Honor. That's the value of the tape recording here, in that it squarely refutes sworn testimony under oath by Mr. Erickson that he and Vilda Murillo never used leading questions. And I'd like to clarify what Judge Kelly actually found in this case. He did not find that there was no deliberate withholding of evidence. He found that there was no evidence. And as counsel who represented Mr. Modell in those proceedings, I made no effort to try that it was a deliberate withholding of evidence, because under Kyles v. Whitley and Strickler v. Green, the prosecutor is obliged to turn over evidence and is responsible, regardless of whether he or she has good faith or bad faith. And I didn't try to prove what I didn't need to in order to prevail. What the allegations in this case are is something entirely different than the cases of Myers v. Morris and Devereux. Here we have children alleging that they were badgered, that they were tricked and that they were frightened and that they were told that they could not go home. They were first removed from their home and then told that if they wanted to be restored to their home, they would have to conform their statements to the scenario of their interrogators. This is not a questioning technique. This is beyond suggestive techniques. This is coercion. And the evidence gleaned by these methods cannot be considered reliable. I think the use of overly suggestive and directive techniques has been recognized since at least the late 60s in the photo ID cases as being unreliable. The fact that Murillo may have believed that these people were all guilty and who also believed that the satanic church case was all true does not impact on whether a reasonable investigator could have believed that these techniques knew or should have known, as Judge O'Neill said and as this Court said in Devereux, that the charges gleaned thereby are false. Well, what is your best authority for that proposition as of 1985? I would cite the cases showing that a person is entitled to be convicted only upon reliable evidence and that the Piles v. Kansas case of the 1941, which took the fact that the suppression of exculpatory evidence, which happened in this case, and the knowing presentation of perjured testimony typically travel together. The way a prosecutor knows that the evidence is shaky or dubious is typically because of exculpatory evidence. We have a part of the problem here is you've got a prosecutor whom we would all agree to whom we would all agree that Brady-Ager's obligation applies, and the knowing use of false perjured testimony from Pile, whatever, applies. But you've also got a sheriff's deputy and you've got a social worker, and the same duties don't self-evidently apply to them. What does apply to them is the use of coercive interrogation techniques. I think it's a mistake to isolate. And what reason stands for that from 1985 or before? The use of, I think, of testimony to compel confessions. We're not talking about use of testimony that goes to the prosecutor. Right. What was the obligation, as you just asserted it, in 1985 or before, on a social worker or a deputy sheriff? Your Honor, the lines of cases that I think are directly relevant are those saying that an investigative officer cannot use suggestive interviewing techniques and that identifications gleaned by these are too real. Now, you know that that's not true of a social worker. That's, Your Honor, the basic problem of how all these cases were developed was a failure to attend to the functional nature of what was going on. Velda Murillo was formerly a social worker, but functionally she was deferred to by deputies, by police officers, as the lead investigator. So was Carol Darling. As social workers, they were not trained under their obligations to record denials, for example, of sex abuse or to make available exculpatory evidence. They had none of the constraints that police officers or investigators typically have whenever they question people. Don't misapprehend my questioning. I'm not trying to condone what they did or, in fact, disprove it either one. I assume I don't condone it. The question, though, is we've got to make a decision about whether there is a constitutional right that's violated and whether that right was clearly established in 1985. And it can't just be up in the air. I mean, we all know coercion is a bad thing. I mean, it's a bad deal. But how is a social worker in 1985, a reasonable social worker, objectively going to know, perhaps mistakenly, what her the constitutional parameters of her conduct are? Your Honor, it has to be readily apparent to an investigator. And I cannot believe that it was not readily apparent to any reasonable investigator at that time that if you threaten a child with removal from her home and say that you can only be restored to your home if you conform your statements to what I want you to say could be believed to generate anything but unreliable evidence. And that is because it is just self-evident? It's coercive. Because there's a case. It would be coercive if applied to an adult. I mean, it would be ironic if children can be led around and coerced in ways that this Court would never count on. Let me tell you what my frustration with this case is, okay? I really want to understand what the arguments are. But nobody has discussed anything about the framework that has to be followed in deciding it. I mean, Saussure tells us you've got, first, to decide whether there's a constitutional right involved. Second, you've got to decide whether the law was clearly established at the time. And third, you've got to decide whether a reasonable person situated as the defendants are or would have realized that her conduct violated a clearly established constitutional right. And everybody here, I mean, from all the papers, the district and the district court as well, is just talking in generalities and lumping everybody together instead of making a discreet analysis with respect to each individual as they were situated at the time. How can you help me out of that conundrum? Well, first, Your Honor, I think the fact that we are in new ground here is comparable to, I think, in U.S. v. Lanier, where the U.S. Supreme Court said the fact that a foster child, foster parent sold her children into slavery or a social worker would do something like that would not, would be regarded as violating the law, even though no one's ever done it before. I mean, this is very unusual. This is not an interviewing technique of believing that because that you must press the child and must repeatedly question the child. This is the use of coercion, the use of lies. These kind of techniques would have been long condemned when used by adults on adults. And I think it's a mistake to isolate the questioning of children as somehow separate from the questioning of any person. Children are people, and they're more vulnerable and malleable than adults. But the use of the techniques described by children, by numbers of children, could not have to do with driving on the child, pressing the child, repeatedly questioning the child, threatening the child, offering favors to the child, inducements, promises, and very serious threats. The kind of coercive questioning like this should not be countenanced, even if there is not any precise case holding that these techniques are bad, because I don't know of any other case in the country where they have, anyone has dared to use them. Okay, so you're asking us to hold that it is self-evident that the techniques that were used by these folks in 1985 was unconstitutional. I mean, is that what you're asking us to do? They were so coercive. You shouldn't ask us to do that. I've just been trying to understand what it is exactly you're asking. I think I'm asking you to hold that the use of questions on anybody, and particularly children, that you know, or should know, will lead to unreliable and false answers is unconstitutional and was clearly established. It violates the right to be convicted only upon reliable evidence. It invites the right to be free from the manufacturing of evidence, of false evidence. And it violates, well, in this case, it violated the right to integrity of family relationships because it led to the disruption of the family relationship. The use of these techniques, because they generate unreliable evidence, because they are so coercive, are not outside the pale of the thrust of the law that, at least since the 30s, it's been recognized the use of force to obtain statements from witnesses is not right, and that anyone should know, especially people familiar with children, that if you use these techniques on a child, that child is going to echo whatever you want he or she to say. That's how I see it. And I'll defer my time. I think I've got we're down to eight minutes. Kagan. That's okay. Mr. Denny. Mr. Denny. What am I talking about? Mr. Masson. Sorry. May it please the Court. My name is Lawrence Masson. I'd like to speak to the issues of absolute immunity and to state actor and to the requisite state of mind, and more particularly what is the knowledge element that is required in order for a supervisor to be found liable with respect to conduct of his subordinates, which he one way or another has supported under the test set out in Larez, which the Court is very familiar with. Is there a final appealable order, Mr. Jagels? Excuse me? Is there a final appealable order as to Jagels? Yes, absolutely. There was a final order entered. Because I know the district court certified for interlocutory reviews, the decision is to Clier and Brad Darling. I don't notice that it's certified as to Jagels, and there certainly are parties and claims that are still left out there, aren't there? There was a judgment. There was a judgment entered as to Jagels, because he was granted summary judgment. And I believe my question is, are there still some parties and claims that are out there? Oh, there are no parties and claims as to Jagels. But there's still more parties to the lawsuit. Absolutely. There's still more parties to the lawsuit. There's still more claims that are still lurking out there, which means we can't hear it unless it's certified, doesn't it? Yes, and it was. It was certified. It was? I'm sorry. That's what I'm asking. I know it was as to Clier and Brad Darling, but it was also certified as to Jagels? I just missed it. This record is tough to go through. No. The certification order is found at our supplemental excerpts of record, pages three through nine, Your Honor. Thanks. Sorry, I didn't grasp what you were asking me. The issue I'd like to address first is the one of Mr. Jagels' state actor   inquiry, and I'd like to offer my views as to why that result should obtain here. The starting point for the whole state actor inquiry is the Supreme Court's McMillian decision. And there are several very key facts to recognize why McMillian, first of all, is distinguishable from the case that we have here. In McMillian, Sheriff Tate was himself accused of engaging in the unconstitutional conduct, which in that case was coercing a co-defendant of McMillian to give perjured testimony, and additionally, the sheriff himself was accused of suppressing exculpatory evidence. So the issue, the central issue in that case was the policymaker issue. Both sides stipulated that Sheriff Tate was a policymaker, and the only question was, those single acts that were charged there by the policymaker himself, was he a policymaker for the county or the state? And the two key facts that I think there was a complex analysis of in Alabama state law, constitutional law, statutory law, and the case law. And the two key facts that I would like the court to focus on that emerged in the McMillian case was that, number one, the court found that the county had no authority to make policy in the area of law enforcement. The district court found that to be true. The 11th Circuit found that to be true. And the Supreme Court, although the Supreme Court in McMillian never said we agree with that analysis, it mentioned it in its own analysis. And I think the only conclusion one could draw is that the Supreme Court, the majority, agreed with that analysis. Namely, in that case, the count, the actor who was the focus, namely the sheriff, could not make policy for the county. And indeed, the county itself could not make law enforcement policy. Now, the Pitts Court, here in California, never made a comparable finding with respect to district attorneys. There is absolutely no finding, and indeed there's no law that I'm aware of, that the Pitts Court could have relied upon to the effect that a district attorney, and by inference, the county, has no authority to make policy in the area of prosecutions. So that's one key fact that I think needs to be kept in mind. The other really important fact in McMillian was that the court found that under Alabama law, and it was the Parker case specifically, the Alabama Supreme Court ruling in Parker, that when the sheriff acts cautiously, and Parker didn't involve a who pays or who may be liable when the sheriff acts cautiously. And the Alabama Supreme Court said that when the sheriff is sued for cautious conduct, independent of the issue of whether or not there may be immunities applicable, it's a suit against the state. And that's always true. Those two things, I think, drove the conclusion in McMillian. As to the second now, there's nothing comparable here in California. That is, if a district attorney acts cautiously, and again, I'm not even talking about 1983 action for the moment, but if a district attorney acts cautiously here in California, it is the county who pays under state statute, assuming that there's no immunity applicable to the individual district attorney. And that's not to say that the state law can immunize that conduct, but it's an expression of the legislature as to who pays as between the state and the county when the district attorney acts cautiously. Now, what I think happened, well, first of all, I think both of those key facts, which were key facts in McMillian, were not even discussed in Pitts. Justice Brown didn't even address them. And what I think happened in Pitts is that, correctly recognizing that there were two very old California Supreme Court cases which held that a district attorney, when personally preparing to prosecute and prosecuting, asked for the state, that that was used to bootstrap the argument that the kinds of conduct that were and training of both lawyers and non-lawyers in the district attorney's office, that the notion that the district attorney, when fulfilling one particular role personally, as clearly established by a California Supreme Court president, means that the district attorney is a state actor with respect to virtually everything else he does, just doesn't follow. You know, the court had difficulty in saying logically they have to follow, but the truth is they don't. And it's not arbitrary to draw that distinction between the district attorney's acting, being a state actor, which essentially means that it's a complete defense. It's a sovereign immunity defense for the municipality. That is the case, and this court affirmed it in Wiener. I mean, it's the same result found in Wiener. But when the district attorney is doing those things that locally, that involve the running of his office, his or her office, the managing of the people, the supervising or not supervising of the people, then those kinds of things are the kinds of things for which there really is no support in McMillian for finding that a California district attorney is representing only the state. That, I think, is a tough issue for you. But I think the analysis is correct if you focus first, my analysis is correct, if you focus first on how McMillian arose, what drove that decision. Now, another tough issue here is, I see I'm stopped. Go ahead. We'll give the other side some more time. The other tough issue here, I personally don't feel as if the absolute immunity is a tough issue here. The absolute immunity is a defense. It was the other side's, we didn't have the burden, don't have the burden of persuasion at trial. And to the extent they had the burden at the summary judgment stage to prove that defense, they just didn't prove it. And part, and it's very clear that part of what is necessary in order to prove that defense is to establish historical precedent. They just didn't do it. I mean, unless this court steps in and does its own legal research and historic research, which I don't think would be appropriate, to find some historical basis for the kind of absolute immunity that they're advocating, really the guts of it is there was a failure of proof at the summary judgment stage on that defense. The really tough issue, and perhaps the toughest issue of the ones that I'm addressing, I think is the one having to do with the state of mind of a supervisor, to find the supervisor liable for the, and it's not supervisor liable for the conduct of his subordinates, but the supervisor liable for his own conduct, which facilitated or ratified in some way the conduct of subordinates, which itself was unconstitutional. And I think the analysis that I set forth in the brief is really the most concise I can provide to you on that. But I'm happy to answer any questions you may have. I take it that you put before the district court the report by the attorney general. That is correct. Now, how do we have to cope with that? Do we have to rule on all the evidentiary issues, or do we just take your allegations at face value and decide whether or not there is immunity, or how do we approach that? Do we have to resolve the admissibility of all of that? No, because I think the ground rule is that you have to assume the facts favorable to the plaintiff. And what did it add, then, to the case at all to have it there? It added for a number of defendants. It showed, first of all, how the sheriff's department, and in particular defendants Clyer and Brad Darling, were responsible on a pretty massive scale for not training and supervising their people, including but not limited to defendant Erickson in this case. And that's the only evidence you have of it is coming from that report? Absolutely not. No. That report has an element of hearsay written all over it, does it not? And you say we have to resolve something with respect to that in order to know the practices and tactics? No, I'm saying that you do not need to resolve them. Can't we just ignore the thing? What would you lose if we were just to ignore the thing? It would be the strength of the ---- it would not remove the sole evidence supporting anything that we've argued for. It would remove what we believe is some powerful evidence supporting other facts, supporting the arguments that we're making. But if you choose to ignore it altogether, it's not going to result in the elimination of the only evidence supporting any one of our points. Well, will it eliminate any issue for us? No. We still have to decide every issue that you say is before it? Correct. And I'm just trying to figure out whether we can ignore it safely or we have to come to grips with it in order to decide your case? I think you only need to focus on the selected portions that we've put before you, plus the underlying interview reports of the special agents of the California Department of Justice, which were authenticated by Special Agent Ballback, who ran that whole investigation. But you're right, Justice Levy. There's a hearsay element there. But, again, you know, at this stage where we're dealing with these issues, I think there's clear nine-circle law that says, you know, you've got to give a little more leeway to inferences and speculation that arise from what was presented to you in order to decide the issues. And I believe we cited that case, although I can't call it to mind right now. All right. Thank you. Thanks. Ms. Thurston. Just to clarify, it's not our position that Mr. Jagels is entitled to absolute immunity for everything he does. Clearly, if he decides to go buy some copy machines or if he decides how many secretaries he needs in his office or how he administers his budget, he's not entitled to absolute immunity. But in this case, had he prosecuted this case according to the training and the policy and the supervision, he would be entitled to prosecutorial immunity. The fact that he has established the training, the supervising, and the policies should not take absolute immunity away from him. Instead, it creates a situation where the prosecutor himself, who acts according to these training and policies, is immune, but his boss is not. And I think Mr. Masson's point about the historical basis for this is clear from Imbler and the cases following that these are prosecutorial functions and are entitled to protection. As to the issues he's raised, the case in Brewster did consider the fact of who pays the judgment if a sheriff is found to be liable in a state action. But it found more compelling the fact that a district attorney has much greater supervision by the attorney general than a sheriff's deputy does or a sheriff's department does, and they found that to be quite compelling. As to the final issue that the court was just asking Mr. Masson about, about the attorney general's report, the attorney general's report, from our view, is simply speculation and inference, exactly as Mr. Masson has stated. But what it is is inference upon inference and speculation upon speculation. It is not evidence in this case. It is evidence in another case. And even the extent that it is in another case is somewhat questionable, based upon the fact that these are not verbatim interviews. These are conclusions by people who are not available to us at this point. The attorney general's report, in fact, would, if you throw that out, you lose the allegations as to Carol Darling, as to Brad Darling concerning medical examinations, as to Ed Jagels on that issue. You lose a great number of claims. So we would argue that that report should be considered if it's thrown out, and those claims that stem from it in the constitutional violations alleged against these individuals should also be thrown out. Thank you, Your Honor. Okay. All right. Thank you. The matter just argued will be submitted, and the Court will stand in recess for the day.
judges: Leavy, Rymer, Paez